UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY RYAN GOVE,

            Plaintiff,

                                    Case No. 18-cv-1335-pp

   v.

SARGENTO FOODS, INC.,

            Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 137) AND DISMISSING CASE**

---

Six years ago the defendant filed a *pro se* complaint that appeared to state a retaliation and discrimination claim against the defendant, his former employer. Dkt. No. 1. Soon after filing an amended complaint, dkt. no. 7, before the court had an opportunity to screen it, the plaintiff began to file discovery motions, dkt. nos. 12, 13. The court gave the plaintiff an opportunity to amend, dkt. no. 19, but dismissed the second amended complaint for failure to state a claim, dkt. no. 23. On appeal, the Seventh Circuit Court of Appeals determined that the plaintiff could proceed on hostile work environment, retaliation and sex and age discrimination claims. Dkt. No. 37. The appellate court expressed "no opinion about how the district court should evaluate the [plaintiff's] case at a any later stage." Id. at 4.

1

On March 3, 2022, the court denied the plaintiff's motion to transfer the case to the Green Bay Division, dkt. no. 47, and the plaintiff again appealed, dkt. no. 49. The Seventh Circuit dismissed the appeal. Dkt. No. 55.

On June 27, 2022, the court held a hearing after the plaintiff had served numerous third-party subpoenas on individuals who were not parties to the case and who appeared to be unrelated to the allegations in the second amended complaint. Dkt. No. 78. The court emphasized to the plaintiff that he was proceeding on his allegations that were civil—not criminal—in nature and that involved employment actions. Id. at 2. At that hearing, the court ruled on the then-pending discovery issues, but the plaintiff subsequently filed an additional nine discovery-related motions. Dkt. Nos. 80, 81, 82, 83, 95, 96, 100, 105, 108. The court then issued two separate orders addressing all pending motions, dkt. nos. 112, 113, the defendant filed a motion for attorneys' fees and costs incurred in opposing the plaintiff's motion to compel (Dkt. No. 83), dkt. no. 114, and the plaintiff filed a notice of appeal, dkt. no. 118.

While the case was pending on appeal, the defendant filed motions for attorneys' fees and costs incurred to compel the plaintiff's discovery responses and to compel his deposition. Dkt. Nos. 123, 129. The Seventh Circuit dismissed the plaintiff's appeal for lack of jurisdiction, dkt. no. 134, and the plaintiff filed 265 pages of "extra docs" with the court that included his amended interrogatory "questions and requests," authorized medical release forms, "additional answers for interrogatory questions and requests" and a series of "Gove Docs," "Gove Notes," and letters, dkt. no. 135. The plaintiff did

2

not authenticate any of these documents and never explained to the court why he filed these documents. The court speculates that the plaintiff may have been trying to supplement his production of documents because of a cover letter directed to the defendant's attorney on pages five and six. Id. at 5-6.

Three weeks later, the defendant filed its motion for summary judgment. Dkt. No. 137. The court since has granted the motions for attorneys' fees and awarded fees and costs of $5,244 that the defendant incurred in opposition to the plaintiff's motion to compel discovery, $1,626 that it incurred to compel the plaintiff's discovery responses and $1,425.25 that it incurred to compel the plaintiff's deposition. Dkt. No. 149.

In its summary judgment motion, the defendant argues that there is no genuine issue of material fact regarding the plaintiff's discrimination, harassment and retaliation claims under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. Dkt. No. 137 at 1-2. The defendant complied with Civil Local Rule 56(a) (E.D. Wis.) and attached the relevant federal and civil local rules to its motion. Dkt. No. 137-1. The defendant made clear that any factual assertion in the defendant's affidavit, declaration and other admissible documentary evidence would be deemed admitted unless the plaintiff filed his own affidavit, declaration or other admissible documentary evidence contradicting the factual assertion. Civil L.R. 56(a)(1)(A).

The plaintiff responded with a twenty-five page "Memorandum of Law to Quash Defendants Summary Judgement" and 131 pages of exhibits, but did

3

not respond to the defendant's proposed findings of fact. Dkt. No. 144. The defendant filed a reply brief. Dkt No. 145. At that point, briefing was complete. Without authorization and almost a week later, however, the plaintiff filed "Plaintiff Amendment to Dkt.144, Page Guide to References Used to Dkt 135, 140-1 & 141-1" and an additional forty-nine pages of exhibits. Dkt. No. 147. He simultaneously filed "Plaintiff's Reaction to the Defendant Erroneous Analogies of his Opposition to their Summary Judgment," with an additional eleven pages of deposition excerpts. Dkt. No. 148.

The court will grant the defendant's motion and dismiss this case with prejudice.

## I. Defendant's Summary Judgment Motion

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Although the court generally gives filings from unrepresented litigants a liberal construction, summary judgment repeatedly has been referred to as the "put up or shut up" moment for parties seeking to take their claims to trial. Johnson v. Cambridge Indus. Inc., 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Even an unrepresented plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts;" he must respond to the defendant's showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue. Anderson, 477 U.S. at 256-57, 261. Because those facts must be admissible at trial, a plaintiff may not rely on inadmissible hearsay, speculation or conclusory allegations to defeat summary judgment. See Prude v. Meli, 76 F.4th 648, 661 (7th Cir. 2023). A bare contention by the non-moving party (in this case, the plaintiff) that an issue of fact exists does not create a factual dispute. Bellaver v. Quanex Corp., 200 F.3d 485, 492 (7th Cir. 2000).

B.      Parties' Arguments

        1.      *Defendant's Brief* (Dkt. No. 138)

The defendant moves to dismiss the harassment claim because the alleged conduct was unrelated to the plaintiff's sex, religion and age and was neither severe nor pervasive. Dkt. No. 138 at 10, 11, 17. The defendant says that the plaintiff didn't report most of the alleged conduct, and what he did report was unsubstantiated. Id. at 13-14. According to the defendant, the plaintiff's allegations regarding the defendant's motivation are entirely speculative and lacking evidence. Id. at 15, 19-21.

The defendant argues that the plaintiff has failed to prove a *prima facie* case of discrimination and retaliation. Id. at 21-25. It maintains that the undisputed facts establish that the defendant terminated the plaintiff after he refused to sign the authorization form to attend EAP (Employee Assistance Program) counseling. Id. at 25. The defendant says that the plaintiff has no basis for asserting that this legitimate, non-discriminatory and non-retaliatory reason was pretextual. Id. at 27. Finally, to the extent that the plaintiff has raised a conspiracy claim, the defendant emphasizes that this is a theory and not a separate cause of action. Id. at 28. In any event, the defendant says the plaintiff's conspiracy allegations fail because there is no viable underlying claim. Id.

        2.      *Plaintiff's Memorandum of Law to Quash Defendants Summary Judgment* (Dkt. No. 144)

The plaintiff begins his twenty-five-page opposition brief by complaining that opposing counsel scheduled his deposition at a location two and a half

6

hours away; he says he drove down the day before the deposition and slept in his van the night before, and that the temperature dropped to the 30s, so he didn't sleep well. Dkt. No. 144 at 1. He says that as a result, he was tired during the deposition and that his answers "are different depending on the context of the questions asked." Id.

In a section titled "INTRODUCTION," the plaintiff says that although the defendant argues that "Clauson was the sole purpose for his termination," this is not true and it "will be disproven." Id. at 1. He concedes that Clauson "played an intricate role in what transpired," he says that she was "used as a pawn by members of the social group from the prior group of people who harassed [him] at the south facility, which used her youth and social group acceptances to convince her to seduce [him]." Id. He alleges that these "events" were "orchestrated;" he says that the defendant "capitalized by levering Clauson as a primary prop to oust what they perceived to be a problem employee," and asserts that the defendant's "stunts in 2017 were designed as a pre-litigation prop to be used in case of a lawsuit." Id. The plaintiff says that he will prove that the defendant "was not only was aware of the events staged from Jul. 2017 to his termination date in April of 2018, but also in prior years." Id. at 2. He says that the defendant "in turn applied techniques to intimidate [him], retaliated against him, and acted maliciously by using cover-up strategies to erase the events," including "manipulating records, falsifying performance evaluations, and altering and hiding documents." Id. The plaintiff attached 131 pages of documents to his opposition brief; he concludes the

7

introduction by stating that he "will use his documentation along with the depositions of [Barbara] Finnel and [Victoria] Zahn to rebuttal the Defendants false accusations." Id. at 2.

The next section of the plaintiff's opposition brief is titled "MISC. ARGUMENTS." Id. Many of the arguments and assertions the plaintiff makes in this section are unsupported by any record evidence. Responding to the defendant's arguments that the plaintiff did not experience harassment based on religion, sex or age, the plaintiff cites what appears to be Barbara Finnel's deposition. Id. at 3. He asserts that he invited Finnel to the defendant's banquet because she had gone to bible studies with him over the years and she follows the same "biblical rules." Id. The plaintiff says that Finnel testified that she followed a biblical diet (which he describes as a diet that doesn't include port or fish without scales); the plaintiff asserts that the menu offerings were halibut wrapped in prosciutto and filet mignon. Id. He contends that halibut is kosher but prosciutto is not, and says that "HR Reprehensive [sic] Jeff Keisner was well aware thru a in-depth discussion when he inquired with the Plaintiff dinner selection, his guest's biblical diet, then Keisner took and marked the choices of the dinner plates which the Plaintiff desired." Id. According to the plaintiff, Finnel remembered going to a banquet, recalled that the plaintiff was upset about the evening, but said that she didn't remember the dinner selection. Id. The plaintiff explains that because of "memory issue from chemo" Finnel needs time to remember things; the plaintiff says Finnel remembers "the Plaintiff was pointing out issues with the dinner plates and management's

8

harassments." Id. The plaintiff says that Finnel recognized that the plaintiff was "pissed off about the whole event of the intentional plate switching[.]" Id. at 4.

In response to the defendant's argument that the plaintiff "merely speculates that comments or conduct related to him," the plaintiff insists that he could tell when people were talking about him because he'd worked with them and knew their personalities and behavior traits. Id. at 4-5. He says he has "stories upon stories in which he can use in preparation of the interrogation of a witness, and in the trial the jury will believe them." Id. at 5. As an example, he references a conversation in which, when asked by "Human Resources Maria Herrera" why Clauson would be mad at him, he said that the reason Clauson may be "pissed off at [the plaintiff] is because she couldn't seduce an older man." Id. The plaintiff believes that is proof that "something was going on" and that Herrera knew of the plaintiff's allegations and believed them. Id.

The defendant asserts that there were "harassments from 2012 to 2018" that continued on a regular basis. Id. at 6. He believes that his coworkers were trying to get him in trouble when he returned to work in 2015 following a car accident. Id. He concedes that there may be a problem with proof for the year 2016 because he accidentally deleted data from four or five USB drives that he kept in a storage locker "for disaster recovery protocols." Id. at 7.

The plaintiff cites several events that he says are supported by the 265 pages titled "extra docs" that he filed some three weeks before the defendants

filed their motion for summary judgment. Id. (citing Dkt. No. 135). For example, the plaintiff alleges that either Dawn Schmal or Stacy Krizenski started a rumor in 2016 that he had an erection while working.[1] Id. The plaintiff says that this led to many off color comments and women constantly staring at his crotch. Id. Months later the supervisor said about a new building that it would be "'really, really cold in there and everyone will be working in confined space', insinuating that you can't be getting an erection there, so we don't want you there." Id. The plaintiff alleges that this was sexual harassment by the supervisor. Id.

The plaintiff asserts that management retaliated against him by switching his start time with someone else's, to "let[] him know what they could do to him.;" he says this is "[a]nother example of how management retaliates to cover a sexual harassment by the women." Id. He estimates that there were at least two and up to eight harassing events each year between 2012 and 2018. Id. He did not identify evidence supporting these estimates. He asserts that Victoria Zahn used Facebook Messenger to spy on people, and that their relationship went from Zahn borrowing his crock pot in 2016 to the two not speaking socially "due to her involvement with Clauson stunts;" he says this is proof that "something big happened to drastically change the work environment!" Id. at 8.

---

[1] The plaintiff cites Dkt. No. 135 at pp. 159-160. As noted, he filed these documents *before* the defendant filed its summary judgment motion and they are not authenticated. Pages 159-160 are two of many pages of single-spaced, typed "notes" apparently written by the plaintiff; they do not appear in the form of an affidavit or declaration and are not sworn to or verified.

10

As the court has noted, despite the warning included in the defendant's brief, the plaintiff did not file a separate response to the defendant's proposed findings of fact. Starting in the middle of page 8 of his opposition brief, and for the remainder of the brief, however, he appears to cite some of the defendant's proposed findings of fact, or parts of those proposed findings of fact—specifically nos. 24, 68, 21, 79, 75, 61, 55, 44, 38, 37, 36, 34, 50, 63, 58, 45, 27, 28, 39, 62, 83, 48, 10, 32 and 9, and confusingly, in that order. Id. at 8-21. In citing these proposed findings, the plaintiff sometimes cites to unauthenticated and—as best the court can tell—inadmissible documents that he filed before the defendant moved for summary judgment, and many of his statements are not responsive to the corresponding findings of fact.

In a section titled "PLAINTIFF FOLLOWED ALL EAP OUTLINES HE AGREED TOO," the plaintiff says that he went to the employee assistance program session, and signed several of the documents related to his attendance. Id. at 8-9. He does not deny, however, that he refused "to accept the language that [Dr. Burbach] could use and re-disclose or release any of [the plaintiff's] medical information to use or re-disclose whom he felt inclined to, without permission in advance from the Plaintiff." Id. at 9. He justifies his refusal by explaining that there was nothing in the form that would have prevented the doctor from releasing his attendance records and results of his findings to the defendant. Id. at 9. Without citing any evidence, the plaintiff asserts that the "intent of the EAP was always a legal maneuver to obtain all his medical records from adulthood through childhood, and preparation of a

11

litigation case." Id. He adds that Wisconsin Unemployment Compensation awarded him benefits, which he says validates his claim of wrongful discharge. Id. at 10.

The next section is titled "HOW THE DEFENDANT IS ERRONEOUSLY SPINNING THE CLAUSON EVENT." Id. Here he admits to adding language to the EAP referral and consent form; he says that those "additional facts corrected the erroneous statements HR was alleging, making the record more accurate and truthful." Id. Some of the next assertions are confusing. The plaintiff says that in a conversation with human resources representative Biehn, "she tried to make it a Clauson an issue;" he says that even though that was "somewhat true," he made clear that the "events which transpired were all related to [the defendant] refusal of not letting Starda transfer to line 251 in June 2014 from sanitation because [the plaintiff] was there!" Id. at 11. At the same time, he says that at his deposition, he was "insinuating Clauson and her social group were looking to get [him] fired." Id. He asserts that the defendant intentionally put him on the line next to Clauson, which allowed her "to strut close to the Plaintiff intentionally and play head games." Id. at 12. He also accuses Clauson of intentionally putting on "every make-up a woman puts on when decking themselves up for a date," including eye liner, blush and a bright red lipstick, and claims that "[w]omen working in production don't do this!" Id.

The plaintiff alleges that Zahn used an identification link through Facebook to spy on his pornography consumption. Id. at 13. Nevertheless, he says that he continued to view pornography because it is not illegal. Id. He says

12

that "[e]verything Clauson had put on was similar to a video [the plaintiff] saw, besides for the pearl necklace, which wouldn't have been allowed on the production area." Id. The plaintiff believes that the defendant joined with Zahn and "the other women" in harassing and discriminating against him; he characterized the defendant as implying, "we know what you viewed and we going to use it against you, rub it in your face, because of what is going on with these women." Id.

The plaintiff cites his own deposition at pages 68-69 as proof that Clauson gave him her phone number to call him. Id. He admits that he contacted her but says it was not harassment. Id. at 14. He says that he wanted to inquire "about her true intention due to a lucid dream that he had of her" in which he walked into her bedroom to serve her something and saw her appearing very old, propped up in bed; he asked to speak with her because he didn't know how to interpret the dream. Id. He says that Clauson was well aware of his "faith beliefs and of no sex before marriage" because he wrote that in a letter in sent her." Id. He says waited to send the letter for almost three weeks after Clauson said "I'm so hot" because she was sending him mixed messages. Id. He claims—without citing any evidence—that Clauson "pointed at her crotch, and made a comment 'he doesn't want this?' to another peer." Id.

Citing documents he filed before the defendant filed for summary judgment, the plaintiff says that he outlined with Keisner "all the stunts by Clauson and peers." Id. at 14-15. He says this included "Behnke and Van Asten thinking they could get [him] fired, Clauson parking lot stunt [], Clauson

whistling stunt imitating a blowjob[], Clauson activating [him] on Facebook messenger, Clauson saying she wanted to fuck the Plaintiff, talked about his faith, politics are like soap operas, latest smear in which [the plaintiff] hate[s] liberals and many other things." Id. at 15.

In a section titled "HOW THE DEFENDANT IS MISLEADING THE COURT," the plaintiff cites eight of the defendant's proposed findings of fact. Id. He says that in a section of the deposition the defendant cited in its proposed finding of fact #63, the topic of questioning was different than what the defendant represents. Id. The plaintiff says that contrary to the defendant's assertion in its proposed finding of fact #58, he did report workplace concerns to Zahn one other time. Id. He also says he reported "what it was like working" with Zahn to "Driessen in Jun. 6th 2014." Id. at 16. The plaintiff cites the defendant's proposed finding of fact #45, in which the defendant says that the plaintiff "did not attribute any of this conduct to his religious beliefs, sex, or age." Id. The plaintiff's response doesn't seem to address this proposed finding, alleging only that he told Herrera that people were having sexual conversations around him. Id. He cites the defendant's proposed finding of fact #27, which describes only where the plaintiff was stationed in the defendant's factory from 2014 to 2016 and who his supervisors were. Id. The plaintiff says that Driessen was his supervisor, and he accuses the defendant of "attempting to exclude Driessen creditability as a witness by devaluing him." Id. Again in citing the defendant's proposed finding of fact #28, the plaintiff's response doesn't appear to address the proposed finding, which states only what the plaintiff's job was

14

from 2016 through 2018, what his shift was and who he reported to. Id. at 17. Nor does his "response" to the defendant's proposed finding of fact #39 appear to address that finding. Id. at 17-18. In response to the defendant's proposed finding #62—that during the March 20, 2018 interview, the plaintiff said he took two days off work due to stress and attributed the conduct to Clauson's rumored return to the plant—the plaintiff goes into detail about the level of stress he was under and why. Id. at 18. Finally, in responding to the defendant's proposed finding #83, where the defendant says that it was only on April 6, 2018 that the plaintiff reported that employees allegedly threw boxes at him, the plaintiff responds that he reported the issue on March 20 to Biehn. Id. at 19.

The next section is titled "HOW [THE DEFENDANT] ALTERS RECORDS TO CAMOFLAGE ISSUES." Id. He cites to the defendant's proposed findings 48, 10, 32 and 9. Id. at 19-23. He asserts that in addition to the Clauson "incidents," he had "roughly a dozen circumstances which required time to write responses on or too, which tallies up to numerous hours and 45 pages of documentation and with additional notes and doc. From other USB drives, total is 128 pages." Id. at 20. He demands to know the location of the defendant's records relating to those "meetings and events, along with the outcome of the investigations?" Id. at 20. He alleges that the defendant "covers up harassments" by manipulating attendance records and falsifying employee reviews as "a form of retaliation by Intimidation." Id. at 22.

15

The final section of the opposition brief is titled "CONCLUSION." Id. at 23. The plaintiff says in this section that he has illustrated through his documentation and the deposition of Barbara Finnel that he "endured continued harassment and discrimination, emotional trauma, by both peers and management while he was employed at" the defendant. Id. He asserts that "[a]ny time a company treats one person different compared to another of a different sex, age or gender group, it is discrimination," and he says that the defendant would have "treated the events completely different if a group of men were doing this to a woman." Id. at 24. He asks whether, because he was "older and a man," "was it deemed acceptable," or whether it was "accepted because of the companies culture or constant history of issues" with him. Id. He says that to get "a full picture of what transgressed," one would have to "read all his documentation, but more specifically 2016 to 2018." Id. He alleges that the defendant "arranged the questions in the Plaintiff's deposition a certain way so they could pack the Summary Judgment motion with inaccurate statements." Id. He complains that "due to the FRCP [he] does not have the space to write rebuttals, or the numbers of additions available to include them." Id. But he says that "[t]he Clauson discrimination event was [the defendant's] catalyst in covering-up what was going on since 2012 and to [the plaintiff's] termination." Id. He maintains that "[t]he history of [his] employment [with the defendant] is a story of what it is like to work in a hostile environment in which corporate culture favors social group's dominance over those who they deem less than

16

them." Id. For all of these reasons, the plaintiff says "the Defendants motion for a Summary Judgment should be quashed!" Id. at 25.

### 3. *Defendant's Reply* (Dkt. No. 145)

The defendant points out that the plaintiff did not dispute the material facts and does not dispute that he refused to sign the healthcare provider's authorization and consent form to complete the EAP program. Dkt. No. 145 at 1. It argues that the plaintiff has not cited to admissible evidence and that he consistently refers to unauthenticated and inadmissible documents. Id. at 3. The defendant asks the court to accept its proposed findings of fact as undisputed and to disregard any materials not supported by admissible evidence. Id.

According to the defendant, the plaintiff frequently contradicts his own deposition testimony. Id. It asserts that the plaintiff testified—remotely—at the beginning of the deposition that nothing impacted his ability to testify. Id. at 3-4 (citing McCann Decl., Ex. 1 at p. 6). The defendant says that in his deposition, the plaintiff testified that he first reported workplace incidents related to Zahn in his March 16, 2018 letter but argues in his opposition brief that he reported problems with Zahn in 2014. Id. at 4 (citing Dkt. No. 144 at 15-16). The defendant points out that in his deposition, the plaintiff testified that he contacted HR at least a half dozen times throughout his six years but now says that he reported conduct at least eight times in 2017 and 2018 alone. Id. (citing Dkt. No. 144 at 20). The defendant argues that a party cannot contradict deposition testimony to survive summary judgment. Id. at 4.

17

The defendant maintains that most of the plaintiff's allegations are entirely speculative. Id. For example, the defendant says that there is nothing sexual or discriminatory in Eric Driessen's comments that the new building was cold or that everyone would be working in a confined space. Id.

As for the Finnel and Zahn deposition testimony cited by the plaintiff, the defendant argues that the testimony does not support the plaintiff's allegations. Id. at 5. The defendant says that Finnel never worked for the defendant and admitted that she does not know the "whole story" behind the defendant's treatment at work. Id. It recounts that Finnel admitted that she "stopped listening" when the plaintiff would speak to her. Id. Similarly, it argues that the citations to Zahn's testimony are not relevant to the plaintiff's claims of employment discrimination. Id. at 6. The defendant emphasizes that Zahn testified that she did not signal Clauson to make a sexual gesture toward the plaintiff, denied monitoring the plaintiff on Facebook and said that she had no knowledge about his beliefs regarding premarital sex. Id. (citing McCann Decl., Ex. C, Zahn Dep at 15-17).

Finally, the defendant argues that the plaintiff did not create a single issue of material fact on summary judgment. Id. at 6-7. The defendant asserts that it had a legitimate, non-discriminatory reason for terminating the plaintiff's employment and that the plaintiff has not established that he suffered severe or pervasive conduct related to any protected category. Id. at 7. The defendant reiterates that its investigation established that the plaintiff did not comply with EAP counseling requirements. Id. at 7-8. According to the

18

defendant, the plaintiff attempts to argue that the phrase "I understand I do not need to sign this form to receive treatment" on the Release of Information to Employer meant that he didn't have to sign *any* form to participate in EAP counseling. Id. at 8 (emphasis in original). The defendant says that the plaintiff's refusal to sign Dr. Daniel Burbach's Informed Consent to Participate in a Psychological Fitness for Vocational Duty Evaluation was a separate issue and was the defendant's "legitimate, lawful reason for ending Plaintiff's employment." Id. (citing Dkt. No. 139, ¶91-94).

The defendant points out that there is no admissible evidence that the plaintiff met with Keisner four times; he testified that he made complaints to HR employees Sonia Otte, Herrera and Beihn. Id. at 9-10 (citing Dkt. No. 140-1, Gove Dept. 84; Dkt. No. 139 at ¶¶38-53). It argues that Keisner was a clerical employee who did not play any role in investigations or complaints. Id.

> ### 4. *Plaintiff Amendment to Dkt. No. 144, Page Guide References to Dkt. No. 135, 140-1 & 141-1* (Dkt. No. 147)

On October 19, 2023—six days after the defendant filed its reply brief—the plaintiff filed an unauthorized, one-page amendment to his opposition brief, with "page guide references used to dkt. 135, 140-1 & 141-1." Dkt. No. 147. The plaintiff attached to this document an additional forty-nine pages of exhibits. Dkt. No. 147-1. Many of the exhibits appear to be pages from his notes or his EAP form, or selected pages from various depositions.

5.   *Plaintiff's Reaction to the Defendant Erroneous Analogies of his Opposition to their Summary Judgment* (Dkt. No. 148)

Also on October 19, 2023, due to what he says was "an extreme amount of inaccurate information" in the defendant's latest filing, the plaintiff filed an unauthorized response to the defendant's reply brief. Dkt. No. 148 at 1. He complains that the paper copy of the depositions doesn't show the "speed and clarity" with which Finnel answered questions other than about the banquet. Id. The plaintiff maintains that Keisner worked in Human Resources and altered records for his date of suspension and modified evaluation reports. Id. at 2. He argues that Zahn was "caught in 3 lies ranging from questions of Lodel, Lorbecki, borrowing the Plaintiff's slow cooker and using Facebook Messenger to message people." Id.

With respect to the defendant's claim that the plaintiff provided no additional facts "of what the peers were doing to management in the Aug. 28, 2017 meeting with HR Keisner," the plaintiff points out that Clauson was "shipped away to work in either the Kiel or Plymouth by May 2017." Id. at 3. He asserts that Driessen's comment in 2016 (presumably about the cold building) was made to shame the plaintiff, and that Clauson putting makeup on in 2017 was "intentional by management." Id. He asserts that this is proof that the defendant was aware that Zahn was spying on him and "abided with peers in sexually harassing him." Id.

C.   Findings of Fact

Other than the arguments raised in his opposition brief, the plaintiff did not file a separate response to the defendant's proposed findings of fact in

20

support of its motion for partial summary judgment, as required by this court's Civil L.R. 56(b)(2)(B). Under Civil L.R. 56(b)(4), the defendant's proposed findings of fact are deemed admitted unless otherwise noted. To the extent that the plaintiff appears to address the defendant's proposed findings in his brief, the majority of his arguments are not supported by a citation "to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The court will disregard any of the plaintiff's arguments that are not properly supported.[2]

The defendant is a family-owned and operated food manufacturer headquartered in Plymouth, Wisconsin, with additional facilities in Elkhart Lake, Kiel, and Hilbert, Wisconsin. Dkt. No. 139 at ¶1. The defendant's Hilbert location has a North facility and South facility. Id. The defendant's products include shredded, sliced and snack natural cheeses for individual consumers. Id. at ¶2. The defendant also manufactures cheeses, appetizers and sauces for restaurants and other food manufacturers. Id.

Laura Biehn worked for the defendant as a Senior Human Resources Business Partner from December 20, 2017 until December 22, 2019. Id. at ¶3. She has worked as the Senior Organizational Development Partner since December 23, 2019. Id. Maria Herrera has worked for the defendant since January 6, 2006. Id. at ¶4. After working as a Production Supervisor in various departments, she began working as a Human Resources Generalist on July 13, 2015. Id. She worked as an Associate Employee Experience Manager from

---

[2] As the court has noted, the defendant included as an attachment to its summary judgment motion Fed. R. Civ. P. 56 and this court's Civil Local Rule 56. Dkt. No. 137-1. This means that the defendant provided the plaintiff with copies of the rules (which he has not followed).

February 2, 2020 until June 6, 2021, and has worked as the defendant's Corporate Office Manager since June 6, 2021. Id.

Jeff Keisner has worked for the defendant since July 6, 1995. Id. at ¶5. He worked as the Human Resources Coordinator at the Hilbert Plant from November 22, 2015 through February 1, 2019. Id. He worked as the Personnel Scheduler at the Kiel Plant from February 1, 2019 through January 16, 2022. Id. He has worked in production at the Hilbert Plant since January 16, 2022. Id. In his role as Human Resources Coordinator, he reported to Biehn but did not play any substantive role in investigating employee complaints. Id. at ¶6. Any function performed by Kiesner related to employee investigations was clerical in nature. Id. He never has maintained authority to issue discipline to the defendant's employees, and he does not recommend disciplinary actions for employees. Id.

### 1. Defendant's Policies

At all times relevant to this lawsuit, including for the years 2012-2018, the defendant maintained an employee handbook detailing its employment policies. Id. at ¶7. The plaintiff received the employee handbook on November 13, 2013. Id. In the handbook, the defendant prohibited discrimination and harassment on the basis of any protected category, including sex, age and religion. Id. at ¶9.

The defendant's harassment policy instructed any employee who felt he or she was subjected to harassment to notify his or her supervisor, manager or

the Human Resources Department.[3] Id. at ¶10. The defendant also prohibited retaliation against any employee who made a complaint or report of discrimination or harassment at the company. Id. at ¶11. On December 9, 2013, the plaintiff read and communicated that he understood the defendant's harassment policy. Id. at ¶12. Through its complaint procedure and open door policies, the defendant directed any employee with a workplace complaint to speak to his or her team leader, supervisor, manager or the human resources department. Id. at ¶13. The defendant distributed these policies annually to employees to read and acknowledge. Id. at ¶14.

The defendant provided employees health and wellness assistance, including professional consultation and counseling that is available through its Employee Assistance Program. Id. at ¶15. The defendant contracted with a third-party provider to provide counseling assistance to employees when necessary. Id. at ¶16. Employees could seek out the EAP voluntarily or human resources could mandate that an employee seek the EAP's counseling services. Id. In 2018, the defendant's EAP program was conducted through a third-party health care provider, Aurora Health Care. Id. at ¶17.

---

[3] In his opposition brief, the plaintiff insists that he spoke with HR "at least 8 times" regarding Clauson and "had roughly a dozen circumstances which required time to write responses on or too, which tallies up to numerous hours and 46 pages of documentation and with additional notes and doc. From other USB drives, total is 128 pages." Dkt. No. 144 at 20. As noted above, the plaintiff did not separately respond to the proposed findings of fact so the defendant's facts are deemed admitted, but more to the point, the plaintiff's brief largely relies on the "extra docs" that he filed prior to the filing of the summary judgment motion. These "extra docs" are not authenticated or signed under penalty of perjury and the plaintiff never explains when, where or why he drafted, edited and annotated the notes he wrote about the events.

When the defendant required an employee to participate in EAP counseling services, it reached out to Aurora to share context regarding the referral. Id. at ¶18. The employee referred to the program then participated in an initial consultation with a counselor. Id. If the counselor agreed that further participation in EAP counseling would be beneficial to the employee, the counselor scheduled a meeting with Dr. Daniel Burbach, a psychologist at Midwest Consultants in Forensic Psychology, LLC. Id. at ¶19.

When the defendant required an employee to attend EAP counseling services, the employee was required to sign a document detailing the expectations of his or her participation in the EAP and the consequences if he or she did not follow the EAP provider's recommendations or was otherwise uncooperative or noncompliant with the program. Id. at ¶20. Additionally, when the defendant required an employee to attend EAP counseling services, the employee had to sign a form titled, "Release of Information to Employer." Id. at ¶21. By signing this form, the employee authorized the EAP provider to report to the defendant his or her attendance at the EAP counseling session (or the failure to attend) and the dates of the EAP assessment(s), agreed to follow through with EAP recommendations, agreed to comply with the treatment recommendations and agreed that he or she understood the consequences of failing to comply with EAP recommendations.[4] Id.

---

[4] In his opposition brief, the plaintiff responds to this finding of fact by explaining that "in hindsight" he cooperated and was compliant with the EAP requirements. Dkt. No. 144 at 9.

24

### 2. *The Plaintiff and His Employment*

The plaintiff, a male, was born on March 24, 1960. Id. at ¶22. He does not have religious beliefs, but ascribes to a "scripture-based" faith grounded on "scrolls." Id. at ¶23. The plaintiff testified that his religious beliefs change "constantly, id. at ¶24 (citing Dkt. No. 140-1 at 5, Tr. p. 20, lines 14-18). In his opposition brief, the plaintiff clarifies (without citation) that "His law of abstinence of sex before marriage has never changed." Dkt. No. 144 at 8.

The plaintiff began his employment at the defendant's North Hilbert facility on February 20, 2012. Dkt. 139 at ¶25. From 2012 until 2014, he worked in the sanitation department. Id. at ¶26. In this position, his job duties and responsibilities consisted of cleaning the machines. Id. The plaintiff worked second shift and reported to Ying Yeng. Id.

From 2014 until 2016, the plaintiff worked on Line 251, where he packaged cheese wedges. Id. at ¶27. At that time, he worked first shift and reported to Yeng and then Jeff Miller.[5] Id. From 2016 until his employment ended on April 30, 2018, the plaintiff worked as a laborer, on the Balanced Breaks and shred lines. Id. at ¶28. He worked on first shift and reported to Erick Driessen. Id.

---

[5] In his opposition brief, the plaintiff appears to respond to this proposed finding by arguing that Driessen supervised him as early as June 2014, that the defendant "is attempting to exclude Driessen creditability [sic] as a witness by devaluing him" and that Driessen handled the "Zahn/Lodel complaint 6-6-14, & both Michaels/Gurner complaints 6-13-14 and about 2 wks later." Dkt. No. 144 at 16 (citing Dkt. No. 135 at 149-50). He again cites the "extra docs" filed *before* the defendant's motion for summary judgment and the notes do not respond directly to the proposed finding. Moreover, he seems to have added bolded text to the notes with language such as "Not sure what this next paragraph was about . . . ." Dkt. No. 135 at 150.

The plaintiff does not possess first-hand knowledge of the disciplinary records of any other of the defendant's employees. Id. at ¶29. He was not involved with disciplinary decisions as one of the defendant's employees. Id. at ¶30.

The plaintiff received a written warning in July or August of 2012 for failing to follow the proper machine lockout procedure correctly. Id. at ¶31. Although the defendant correctly administered his written warning, the plaintiff believes he received it because Bruce Behnke and Joe Skarga wanted the defendant to terminate his employment. Id. at ¶32. The plaintiff admits that he was not party to any conversations with Behnke or Skarga in which they stated any motivation to have the defendant terminate his employment. Id. at ¶32. The plaintiff does not possess first-hand knowledge or basis for his belief that in 2012 Skarga "deliberately" performed tasks to slow the plaintiff at work such as shutting off machines or hitting the emergency stop button. Id. at ¶33.

3.    *Katie Clauson Reported the Plaintiff's Behavior*

On February 22, 2017, employee Katie Clauson reported to Human Resources Generalist Maria Herrera that the plaintiff had engaged in harassing behavior towards her. Id. at ¶34. Without citing to the record, the plaintiff denies that it was harassment and says that he was "inquiring about her true intention due to a lucid dream he had of her." Dkt. No. 144 at 14. Regardless, the behavior Clauson reported to Herrera included that the plaintiff had asked her for her phone number, sent her a message asking her to meet up, asked her to talk and asked her why she had been distant with him. Dkt. No. 139 at

26

¶35. Clauson described to Herrera that the plaintiff's behavior culminated when he sent her a lengthy Facebook message. Id.; Dkt. No. 140-1 at 75-83. A few days after Clauson reported the plaintiff's behavior, Herrera discussed the issues with the plaintiff. Dkt. No. 139 at ¶37. Herrera advised the plaintiff to keep his workplace interactions professional at all times. Id. She also reiterated Clauson's message that Clauson was not interested in the plaintiff's advances. Id. In his opposition brief, the plaintiff argues that avoiding Clauson proved to be "futile" because before the defendant moved Clauson to another line, Clauson put on "every make-up a woman puts on while decking themselves up for a date" such as eyeliner, blush and bright red lipstick. Dkt. No. 144 at 12. The plaintiff asserts—without citing to any evidence—that the defendant intentionally placed Clauson next to him on the line so she could strut close and "play head games." Id.

4.     *The Plaintiff Reports Interactions with Clauson*

Following his February 2017 meeting with Herrera regarding Clauson's complaint about him, the plaintiff reported conduct related to Clauson to human resources. Dkt. No. 139 at ¶38. The conduct included that Clauson had ignored him, failed to acknowledge him, stared at him, walked in front of him, failed to say good morning to him and did not "say[] a word" to him. Id.

On March 9, 2017, the plaintiff met with Herrera and reported that he believed he completed the work of two people, failed to sleep well and that he experienced back soreness. Id. at ¶39. The plaintiff attributed his sleep issues to working on Saturdays. Id. (citing Dkt. No. 140-1 at 32, Tr. p. 74, lines 22-25;

27

Tr. p. 75, lines 1-25; Tr. p. 76, lines 1-6). The plaintiff met with Herrera again on April 11, 2017 and reported that Clauson "put[] herself in front of [Plaintiff], just to be seen;" tried to get a "reaction" from the plaintiff; moved slowly in front of him and "put[] herself on display;" forgot to take off her smock before leaving the production area; stared at the plaintiff; stared out the window with another employee at the parking lot toward plaintiff's car; smirked at Plaintiff and "w[ore] makeup so that [he] notice[s.]" Dkt. 139 at ¶40. The plaintiff stated in this meeting that Clauson's behavior did not prevent him from performing his work. Id. at ¶41.

On April 20, 2017, the plaintiff met with Herrera and reported that Clauson wore her hair down and, on one occasion, put her purse over her shoulder, pulling it up at the same time that she put her tongue in her cheek. The plaintiff believed that with these actions, Clauson was mimicking fellatio. Id. at ¶42. During one of his meetings with Herrera, the plaintiff reported that Clauson had approached him and stated that "she[ was] so hot," and stood close to him on the line. Id. at ¶43. The plaintiff attributed all these events to his personal dispute with Clauson and testified in his deposition that Clauson was trying to get him fired. Id. at ¶44; Dkt. No. 140-1 at 29, Tr. P. 71, lines 4-16. No one told the plaintiff, however, that Clauson was trying to get him fired. Dkt. No. 140-1 at 29, Tr. p. 71, lines 14-16. When speaking with Herrera, the plaintiff did not attribute any of this conduct to his religious beliefs, sex or age. Dkt. No. 139 at ¶45. In his opposition brief, the plaintiff argues that this was because he was clueless as to what was going on in the first meeting with

28

Herrera but claims that in the missing 2016 documentation there would have been confirmation that Lorbecki said to Owen Carl, "Tim said you have to be married to have sex," and that Carl replied "Fuck that." Dkt. No. 144 at 16.

When Clauson started working for the defendant, she was a contract employee placed at the defendant's North Hilbert facility on first shift. Dkt. No. 139 at ¶46. On April 17, 2017, Sargento hired Clauson as a full-time employee. Id. When she was hired as a full-time employee, she worked in production primarily at the defendant's South Hilbert facility. Id. Clauson worked on third shift from April 17, 2017 until June 21, 2018. Id.

At one point, after the plaintiff learned that the defendant had hired Clauson for full-time employment and before she transferred to third shift, the plaintiff told Clauson she did not have to worry about anything happening between them. Id. at ¶47. Clauson became upset, "said fuck a couple of times," and walked away. Id.

When Clauson began working third shift at the South Hilbert facility, the plaintiff's complaints regarding workplace behavior stopped. Id. at ¶48. Clauson applied for a first shift position in the Hilbert facility in February 2018. Id. at ¶49. The defendant offered her the position, but she declined it. Id. Clauson did not return to the North Hilbert facility before the plaintiff's employment ended. Id.

5.   *The Defendant Investigates the Plaintiff's Workplace Complaints*

Between April 21, 2017 and March 15, 2018, the plaintiff did not communicate to the defendant any complaint of workplace conduct by co-

29

workers. Id. at ¶50. The plaintiff testified in his deposition that he did not "run to HR whining about everything that happen[ed]" during his employment because otherwise he would have been in there probably couple of times a week. Id. at ¶51 (citing Dkt. No. 140-1 at 30, Tr. p. 72, lines 19-21.

On March 16, 2018, the plaintiff delivered a letter to the human resources department that described workplace issues he had experienced since January 16, 2018. Id. at ¶52. The plaintiff attributed the "tension" he perceived at work to his personal issue with Clauson and rumors that Clauson would return to the North Hilbert facility. Id. at ¶53. Senior Human Resources Business Partner Laura Biehn immediately investigated the plaintiff's allegations. Id. at ¶54.

On March 20, 2018, Biehn interviewed the plaintiff about the allegations in his March 16, 2018 letter.[6] Id. at ¶55. During the March 20 interview, the plaintiff alleged that his co-worker, Bruce Behnke, tried to get the plaintiff fired in 2012 or 2013. Id. at ¶56. The plaintiff also alleged Behnke would "smart-mouth" or "slander him" by making remarks such as "there he goes again" in reference to the plaintiff. Id. Finally, the plaintiff alleged that Behnke tried to provoke a fight with the plaintiff by running into him in a hallway and making a gesture that he was going to "pound" the plaintiff, and that fellow employee Jeff Van Asten told Behnke that "someone should put him six feet under." Id.

---

[6] The plaintiff argues in his opposition brief that Biehn tried to spin the conversation about all of the events by blaming them on his dispute with Clauson. He relies on his "extra notes" filed prior to the summary judgment motion; the court is not sure how these improperly filed documents address the defendant's proposed findings of fact about the March 20, 2018 meeting.

The plaintiff did not hear Van Asten refer to the plaintiff in making the "six feet under" comment. Id. at ¶57.

During the March 20, 2018 interview, the plaintiff described his issues with Victoria Zahn. Id. at ¶58. He labeled Zahn as a complainer who almost ran into him in their workspace. Id. He alleged that Zahn has a daughter who worked at a hair salon where he spoke about his workplace issues. Id. This was the first time that the plaintiff had reported to the defendant any workplace concerns regarding Zahn. Id. Zahn's daughter never worked for the defendant, and the plaintiff never communicated with Zahn's daughter. Id. at ¶59.

During the March 20, 2018 interview, the plaintiff claimed that Aaron Beitler said he "wanted to beat the shit out of him." Id. at ¶60. The plaintiff did not hear Beitler refer to the plaintiff when making this comment. Id. The plaintiff attributed the conduct of Behnke, Van Asten, Zahn and Beitler to his dispute with Clauson in 2017.[7] Id. at ¶61. He also alleged that he took two days off work due to stress and attributed the conduct he discussed in his letter and in the interview to Clauson's rumored return the facility. Id. at ¶62.

Biehn told the plaintiff that Clauson would not return to the North Hilbert facility. Id. at ¶63. In response, the plaintiff stated that he did not

---

[7] The plaintiff appears to be arguing that all this conduct relates back to the defendant's "refusal to let Starda transfer to line 251 in June of 2014" because "[the defendant] was there!" and that if the defendant would have disciplined Starda for what he was doing things would have been different. Dkt. No. 144 at 11. The court is not sure whether Starda (plaintiff's brief) and Skarga (defendant's brief) are the same person. Without responses to the proposed findings, any additional proposed findings by the plaintiff, record evidence, dates, names, admissible documentation or any sort of timeline, the court cannot determine how the events of 2014 and the failure to transfer Starda (or Skarga) relate to this proposed finding.

31

believe Biehn and then asked, "[w]hy are we even having this conversation then?" Id.

On March 22, 2018, Biehn spoke with the plaintiff's supervisor, Erick Driessen. Id. at ¶64. Driessen told Biehn that he did not observe the plaintiff's co-workers engage in bullying or harassing behavior directed at the plaintiff. Id. Driessen also told Biehn that the plaintiff was a loner and that most people did not enjoy working with him because he was not particularly friendly with anyone. Id. That same day, Biehn spoke with Behnke, who stated that his personality clashed with the plaintiff's personality but that any conflict was insignificant. Id. at ¶65. Behnke alleged that when the plaintiff worked in sanitation, he tried to get Behnke fired. Id. As a result of those circumstances, Behnke told Biehn that he did not often speak to the plaintiff. Id. Behnke denied running into the plaintiff and denied making any "pound motion" towards the plaintiff. Id. at ¶66.

On March 23, 2018, Behnke called Biehn and recalled that with the construction that took place at the facility, the hallways were tight and it was possible he bumped into someone in the hallway. Id. at ¶67. He also stated that he may have made a gesture in which his elbow hit his hand, since he does that motion frequently. Id. Biehn advised Behnke to be aware of his surroundings and to stop making the motion he described. Id.

On March 27, 2018, Biehn spoke with Zahn. Id. at ¶68. Zahn denied that her daughter had said anything to her about discussions of any of the defendant's employees. Id. at ¶68. When Biehn asked Zahn about the plaintiff

specifically, Zahn stated that he had stopped speaking to her four or five months previously. Id.

On April 3, 2018, Biehn spoke with Aaron Beitler. Id. at ¶69. Beitler denied seeing the "pound" gesture that the plaintiff had described performed by anyone at work. Id. Beitler denied witnessing or hearing any interactions between the plaintiff and Behnke. Id. Beitler also denied hearing or stating any phrases such as "pound you," "kick your ass," or "beat the shit out of you" while at work. Id. Beitler recalled Clauson asking Beitler to escort her to her car because she felt uncomfortable around the plaintiff. Id. at ¶70.

On March 27, 2018, Herrera emailed Biehn a summary of the plaintiff's discussions with her in 2017 regarding his disputes with Clauson. Id. at ¶71. On April 3, 2018, Biehn spoke with the plaintiff again. Id. at ¶72. During this meeting, the plaintiff told Biehn that there had not been any additional issues regarding interactions or communications with his co-workers since they last spoke. Id. The defendant never disciplined the plaintiff for raising complaints in the workplace. Id. at ¶73.

6. *The Plaintiff Refuses to Participate in EAP Counseling*

Following Biehn's investigation, the defendant concluded that it had not corroborated the plaintiff's allegations of misconduct by other of the defendant's employees. Id. at ¶74. Biehn filed a declaration explaining that she recognized that the plaintiff struggled at work and with his relationships in the workplace. Id. at ¶75 (citing dkt. no. 141 at ¶32). She said that the plaintiff took time off, which he attributed to work-related stress. Id. Biehn stated that

33

the plaintiff clearly was focused on Clauson, even though they had not worked together or interacted for nearly a year. Id. Biehn said that in his March 20, 2018 meeting with her, the plaintiff seemed inexplicably agitated, changed his story about events he described to her and appeared to believe that his co-workers were conspiring against him without any support for such conclusions.[8] Id. (citing Dkt. No. 141 at ¶24). As a result of the plaintiff's several unsubstantiated complaints over the course of approximately twelve months—largely related to an employee who no longer worked with him—and the plaintiff's distress, the defendant referred the plaintiff to its EAP for counseling. Id. at ¶76.

On April 6, 2018, Herrera and Biehn met with the plaintiff to discuss the outcome of the investigation and the defendant's EAP counseling program. Id. at ¶77. During the April 6, 2018 meeting, the plaintiff signed an EAP referral and consent form, which detailed the defendant's expectations for him and the consequences for his employment if he failed to comply with the EAP counseling program. Id. at ¶78. The plaintiff added his own language to the EAP form, in pen, to memorialize his version of events. Id. at ¶79; Dkt. No. 140-1 at 66. In his brief, the plaintiff asserts that he was deliberately distracted while adding the notes to the form. Dkt. No. 144 at 10.

During the April 6 meeting, the plaintiff signed the "Release of Information to Employer Form." Dkt. No. 139 at ¶81. The plaintiff did not make

---

[8] The plaintiff argues that there is no record to support this finding but Biehn filed a declaration, based on personal knowledge and signed under penalty of perjury.

any handwritten changes to this form. Id. Through the April 6 meeting, the plaintiff understood that if he did not cooperate with the EAP, the defendant could issue him disciplinary action up to and including termination of his employment. Id. at ¶82. At the meeting, the plaintiff reported to Biehn and Herrera, for the first time, an incident in which the defendant's employees allegedly threw boxes at him. Id. at ¶83. The plaintiff stated that this incident occurred on March 12, 2018. Id.

After the April 6, 2018 meeting, Biehn spoke with the plaintiff's supervisor the same day. Id. at ¶84. The supervisor denied that any employees threw boxes at the plaintiff. Id. Biehn then contacted Aurora to initiate the EAP process. Id. at ¶85. Following his initial assessment, the plaintiff scheduled an EAP counseling appointment with psychologist Dr. Daniel Burbach on April 25, 2018. Id. at ¶86. To participate in the EAP session, Burbach required the plaintiff to sign an authorization and consent form entitled "Informed Consent to Participate in A Psychological Fitness for Vocational Duty Evaluation." Id. at ¶87. The plaintiff added conditions to Dr. Burbach's form: (1) that Dr. Burbach could not consult another expert without the plaintiff's permission and (2) that Dr. Burbach could not use information from third-party sources, including health information related to physical or mental health conditions, for purposes of the program. Id. at ¶88; Dkt. No. 140-1 at 67. The plaintiff refused to participate in the appointment without these conditions and Dr. Burbach could not proceed with the plaintiff's inserted conditions. Dkt. No. 139 at ¶90. As a result, the plaintiff did not attend an appointment with Dr. Burbach. Id.

Following the April 25, 2018 appointment, Dr. Burbach's office informed the defendant that Dr. Burbach was unable to complete the plaintiff's appointment and assessment based on the plaintiff's unwillingness to accept the authorization form. Id. at ¶91. Biehn spoke with the plaintiff on April 26, 2018 and Dr. Burbach on April 30, 2018 regarding the plaintiff's refusal to accept the language in Dr. Burbach's authorization form. Id. at ¶92. Biehn concluded from her discussions with the plaintiff and Dr. Burbach that the plaintiff did not have his EAP appointment on April 25 because of his unwillingness to accept Dr. Burbach's authorization form. Id. at ¶93.

On April 30, 2018, the defendant terminated the plaintiff's employment because he refused to comply with the company's EAP counseling requirements. Id. at ¶94.

### 7. *Similarly Situated Individuals*

The plaintiff believes that "[a]ny employee who wasn't harassed or liked by supervisors" was treated better than him. Id. at ¶95. Joe Skarga is a male in his sixties. Id. at ¶96. Bruce Benhke is a male in his forties. Id. at ¶97. Dawn Michels is a female in her forties. Id. at ¶98. Dan Gurner is a male in his thirties. Id. at ¶99. Wendy Mueller is a female in her forties. Id. at ¶100. Vicky Zahn is a female who is in her sixties. Id. at ¶ 101. Mark Miller is a male in his forties. Id. at ¶102. Melissa Bratz/Berg is a female in her twenties or thirties. Id. at ¶103. Katie Clauson is a female in her twenties. Id. at ¶104. Cathy Bale is a female in her thirties or forties. Id. at ¶105. Shaw Carter is a male in his forties. Id. at ¶106. Owen Carle is a male in his twenties. Id. at ¶107. Emily

36

DenDecker is a female in her thirties. Id. at ¶108. Ricky Ferron is a male in his fifties. Id. at ¶109. Jill Lorbiecki is a female who is in her forties. Id. at ¶110. Aaron Beitler is a male in his twenties or thirties. Id. at ¶111. Delia Santos is a female in her fifties or sixties. Id. at ¶112.

### 8. *Administrative Proceedings*

The plaintiff filed his charge of discrimination with the U.S. Equal Employment Opportunity Commission on or about June 9, 2018. Id. at ¶113. The EEOC issued its dismissal and notice of right to sue letter on June 15, 2018. Id. at ¶114.

### D. Conclusions of Law

### 1. *Harassment*

The Seventh Circuit allowed the plaintiff to proceed on a hostile work environment claim, which has four elements: (1) the plaintiff was subject to unwelcome harassment; (2) the harassment was based on a protected characteristic; (3) the harassment was so severe or pervasive that it altered the conditions of his employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. Smith v. Ill. Dep't of Transp., 936 F.3d 554, 560 (7th Cir. 2019).

Additionally, an employer's liability for a hostile work environment claim depends on whether the harasser was the victim's supervisor or merely a co-employee. Paschall v. Tube Processing Corp., 28 F.4th 805, 813 (7th Cir. 2022). When the harasser is a co-employee, the employer is liable "only when the employee shows that [his] employer has been negligent either in discovering or

remedying the harassment." Id. The employer's legal duty in co-employee harassment cases is discharged "if it takes 'reasonable steps to discover and rectify acts of harassment of its employees.'" Id. (Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir.1997)). Because the law does not expect employers to be aware of every impropriety committed by every low-level employee, "notice or knowledge of the harassment is a prerequisite for liability." Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1035 (7th Cir. 1998). When an employee reports harassment to the employer, the employee must provide "enough information to make a reasonable employer think there was some probability that [he] was being sexually [or racially] harassed." Cooper-Schut v. Visteon Auto. Sys., 361 F.3d 421, 426 (7th Cir. 2004) (quoting Zimmerman v. Cook Cnty. Sheriff's Dept., 96 F.3d 1017, 1019 (7th Cir.1996)).

a. Unwelcome Harassment

It is difficult to pin down what the plaintiff alleges occurred, when it occurred and whether (and to whom) the plaintiff reported it. In the second amended complaint, the plaintiff alleged that Clauson "came on" to him, walked in front of a crowd of women telling the plaintiff how hot she was and made a sexual gesture of fellatio at him. Dkt. No. 20 at 5-7. He alleged that Tammy Wolf said "I like a mushroom with a nine inch stem" and that Kathy Griffey said she "needed something to suck on" when he told her that her upper lip was raw. Id. at 7. He alleged that Aaron Beitler said that "every time I see him, I want to beat the fuck out of him," which the plaintiff believed to be about him. Id. at 8. The plaintiff further alleged that Sonia Otte from Human

38

Resources purposefully didn't call his name for acknowledgement of five years of service at a company banquet, and that Jeff Kiesner intentionally changed his dinner order at that banquet. Id. at 10.

The plaintiff failed to support or even argue some of these allegations when responding to the defendant's summary judgment motion. He never mentioned Wolf or Griffey in his opposition brief. At one point in the brief, he argued that he has "stories upon stories in which he can use in preparation of the interrogation of a witness," but he did not relate those stories in his brief or identify record evidence. See Dkt. No. 144 at 5. And stories—without evidentiary support—cannot defeat a summary judgment motion. The defendant warned the plaintiff that any factual assertion in the defendant's affidavits, declarations and other documentary evidence would be accepted by the court as true unless the plaintiff provided his own admissible documentary evidence. Dkt. No. 137 at ¶4. The defendant provided the plaintiff with a copy of the local rules explaining that the plaintiff must reproduce each numbered paragraph in the proposed finding of facts and include his response with specific references to affidavits, declarations and parts of the record. Dkt. No. 137-1 at 9 (citing Civil L.R. 56(b)(2)(B)(i)). The plaintiff's failure to comply with this rule is not excusable simply because he lacks legal training. Hill v. Thalacker, 210 F. Appx. 513, 515 (7th Cir. 2006) (holding that district courts have discretion to enforce procedural rules against pro se litigants).

In his opposition brief, the plaintiff chose to selectively address proposed findings 24, 68, 21, 79, 75, 61, 55, 44, 38, 36, 34, 50, 63, 58, 45, 27, 28, 39,

39

62, 83, 48, 10, 32, and 9 (twenty-four of the 114 proposed findings of fact).
Dkt. No. 144 at 8-25. Even then, the plaintiff did not admit or deny the
proposed findings and—with the exception of a few deposition transcripts—
failed to cite to evidence in a form that would be admissible at trial. See
Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009). He often cited to the
"extra docs" that he filed *before* the defendant moved for summary judgment.
Dkt. No. 144 at 8, 10-23 (citing Dkt. No. 135). He referred to the extra
documents as "Gove notes" but the court does not know where, when or why
they were prepared and can only assume that he is the author. These notes are
not signed under penalty of perjury and are not accompanied by a declaration
or affidavit. The plaintiff also filed hundreds of pages of documents to which he
has not cited. Yet he asserted that one would have to read every page of all his
documents to figure out what he is trying to prove. The Seventh Circuit has
repeatedly warned that on summary judgment, a court is not required "to
assume the truth of a nonmovant's conclusory allegations on faith or to scour
the record to unearth material factual disputes.'" Castelino v. Rose-Hulman
Inst. of Tech., 999 F.3d 1031, 1040 (7th Cir. 2021) (quoting Skiba v. Ill. Cent.
R.R. Co., 884 F.3d 708, 722-23 (7th Cir. 2018)).

The plaintiff makes vague, general allegations about conduct in "prior
years" and the "events staged from Jul. 2017 to his termination date in April of
2018." Dkt. No. 144 at 2. The record evidence establishes that the plaintiff first
reported "harassing" conduct only after Clauson reported his harassing
conduct on February 22, 2017. Dkt No. 139 at ¶34. Clauson said that the

40

plaintiff asked for her phone number, asked to talk, asked why she had been distant and sent a long Facebook message. Id. at ¶35; Dkt. No. 140-1 at 27, 75-84. A copy of the Facebook message is attached to the plaintiff's deposition transcript. Dkt. No. 140-1 at 75-84. In that message, the plaintiff said that he could not go without telling Clauson how he felt about her, referred to their "enjoyable chemistry," her body language and the fact that she kept "close proximity" with the plaintiff. Id. He mentioned that he loved looking into "those beautiful green eyes" and asked her on a date. Id. Only after Herrera met with the plaintiff about this conduct did the plaintiff report that Clauson had ignored him, failed to acknowledge him, stared at him, walked in front of him, failed to say good morning and did not say a word to him. Dkt. No. 139 at ¶38.

The plaintiff's only response to these defense proposed findings of fact was to accuse the defendant of purposely placing Clauson next to him on the line to "strut close to the plaintiff intentionally and play head games," dkt. no. 144 at 12, and to cite to the following "notes" filed as "extra docs" (again, before the defendant moved for summary judgment):

> 2-24-17 friday called to marie herra's office. her responce was katie came to her thursady and was concerned that I would continue sending her emails. eventhought she said that it said i said that this woudl be it. so I read from messenger what I wrote katie. I thought maria was going to cry. i also explained that with a sneeze, our close proximity would have made us touch our body parts. I explained that I had no idea what was going on and why and really missed the close discussion that we would have and i was still open to being friends but wasn't going to say a word until she said hi first. and that if people are compatable , their is no ones right and no ones wrong. she also had me read katies response to me. Everyone at work knew what was going on. Katie made me look like a staker! Second, katie filed her complaint tuesday, after her staged stunt. interesting too is maria said that katie never read the

41

> emails to her. after work i was scraping off the snow on my car when katie walked by me. as she walked by me she had a big smile on her face. her ride was about five or six cars down. i realized she was laughing at me.

Dkt. No. 135 at 69.

The plaintiff does not dispute that he met with Herrera on other occasions after that date, complaining that Clauson put herself in front of him just to be seen, tried to get a reaction from him by moving slowly in front of him and putting herself on display, forgot to take her smock off before leaving the production area, stared out the window at the parking lot toward the plaintiff's car, smirked at him and wore makeup so he would notice. Dkt. No. 139 at ¶40. The plaintiff told Herrera, however, that this did not prevent him from doing his work. Id. at ¶41. The plaintiff does not dispute that on April 20, 2017, the plaintiff met with Herrera and reported that Clauson wore her hair down and, on one occasion, put her purse over her shoulder, pulling it up at the same time she put her tongue in her check. Id. at ¶42. The plaintiff believes that Clauson was mimicking fellatio with this conduct. Id.; Dkt. No. 140-1 at 43, lines 8-11. The plaintiff also reported to Herrera that Clauson approached him, said she was "so hot," and then stood close to him on the line. Id. at ¶43 (Dkt. No. 140-1 at 99, lines 1-25).

The plaintiff argues in his brief that the defendant was aware of the events between July of 2017 and his termination in April of 2018 but also claims that the defendant was aware of events "in prior years." Dkt. No. 144 at 2. He fails to provide any record citation for this argument. The plaintiff cites the "Wendy Mueller harassment event in Oct. 2014," but the court does not

know what the plaintiff is referring to. The only explanation he provides is that "when you are walking past two people in the lunchroom and hear them say 'some things never change,' you just got harassed and you're the bad guy for reporting it to management." Id.

According to the plaintiff, the "harassments from 2012 to 2018 continued on a regular basis," and that "later on the speed of the line of the shredding cheese is turned up so fast it's impossible to keep up." Id. at 6. Again, the court doesn't know what "harassments" the plaintiff is referring to beyond what he reported to Herrera in 2017 and 2018. Moreover, his "notes" about speeding up the line read as follows:

> . . . Later I was talking to Vickie Z and asked her how her vacations was the said the same thing that I said to Amy. She said' I didn't think a minute of this place when I was gone. Then I told her was Dave said to me, she said that was in appropriate. I told her that what I said to amy and saw him talking to bruce. I also commented to her that jeff van asten can make comments that the company is just screwing over the worker and no body says a work. Not to mention that he is the lazest person around. She made a comment that is bs what some people do around here and the favoriates the bosses have. Later after lunch, dave was talking to jeremey. I was weighing 30 lb box of ¼" cubes cheese and Vicking was filling thm. I was also putting bags back into the boxes. Jeremy upped the line speed in which 31 to 33 lbs were dumping into the boxes everytime. We could not keep up. Vz was blowing a gasket! My half and hour was up and I rotated to palletizeing. There were no box cheese to open and they were in blue bags and the pallets were saran wrapped. Amy said that I could go help inside since there was not much out here to do. So I did. I went over by Vickie and started to bag boxes for here. She commented ' know thtat is team work!' we rotated like that the rest of the day. Somehow the line speed was turned back down. Depending on who is working with you on the line, certain people like Eric or Jeremy would turn up the line delibertly.

> . . . .

> I was working in pack area with Melissa bratz (formly Berg), jeff van asten, steve guiser, Mark Miller. Jeff was working behind me in the rotation. It appeared all of them besides steve had an attitude towards me. I was folding box flaps, jeff was supposted to do the boxed that kicked off of the scale. Twice when they were piling up (3) I yelled for him to let him know. He was standing ten feet away and refused to acknowledge me. Mike , was walking by and as he looked at jeff as I was trying to get his attention, he laughed and winked at mike. Another thing he would do is wait for the rotation, and leave the boxes there, I would check and put them back on before I rotated. Lazy fucking asshole!
>
> what a contrast to the past day. Jeff was more than helpful. He ran over me from a different station even though I didn't need help (untangleing the bottom tape machine in palletizing area). The box labeler need changing soon so I started stacking boxes on the pallet Melissa earlier took away. When I was doing it, she mentioned that I didn't need to due it. Steve had to change the labeler, as he was, I put on about a row and a half of boxes. The line would have been shut down if the boxes weren't there. This is an example of how they rebel against everything the company ask them ot do. By not doing it without complications of shutting down the line. Its to teach the company a lesson. This is jeff's influence.

Dkt. No. 135 at 55.

Even assuming that the plaintiff had testified, proffered a declaration or affidavit or even signed his notes under penalty of perjury, his notes don't support a finding of harassing conduct directed at him but rather conduct undertaken by certain employees to "rebel against everything" or to "teach the company a lesson" (using the plaintiff's own words). Id.

As for harassing conduct in 2016, the plaintiff admits that he deleted the documentation. Dkt. No. 144 at 7. He then asserts that in 2016, "either Dawn Schmal or Stacy Krizenski started a rumor that the Plaintiff got an erection while working" and that "Amy Fucile and Melissa Bratz ran with it." Dkt. No. 144 at 7. He further argued that "months later," Driessen "made a

44

discriminatory remark when talking about the new building that due to its 'going to be really, really cold in there and everyone will be working in confined space', insinuating that you can't be getting an erection there, so we don't want you there." Id. Again, he cites the "extra docs" he filed with the court *prior to* the summary judgment motion. At pages 159-160 of the "extra docs," the plaintiff summarized the event as follows:

2016

I don't have much to report on 2016 due to two different reasons. One my files on this year is lost, and second, the main peers who were persecuting me left to work on the Balanced Snacks division at the new North plant in Hilbert.

1-11-16. Monday. I was working with Dawn Schmal and her sister Stacey Krizenesky on line 255 of the south building in the pack area. It was uncommonly cold due to the no weekend work and a shortage of the number of workday week before. Line 251 wasn't running today.

I started boxing the shredded bags of cheese. I was working up a sweat with the rate of speed the bags were coming out. I rotated to the next position, which was standing there putting down boxes for the bagger, and taping the boxes closed.

As I just stood there, I immediately began to cool down, and my crotch started to shrink towards my body. I attempted to adjust myself; but I crabbed the wrong underwear in the morning. The underwear I was wearing was very loose, and didn't offer much support. As my stuff shrank, it looked like my thumb sticking out. There was nothing I could do. Dawn and Stacy immediately noticed it. It was so embarrassing!

I've always have had a lot of movement down there because of temperature swings I've had since puberty. A couple of ways I minimized the swings. One was by wearing underwear that was supportive, it kept my parts close to the body, kept my temp there consistant. Second, was always moving around. These

45

two things seemed to keep my body temperature regulated. Up to this point, no one knew of this.

I believe the rest of the week line 251 was running. Everything was quite until Friday. Stacey told Melissa Bratz, because the news of what happened spread like wild fire to all the women. Melissa uses everything she can against me if given a chance. I found that when I spoke to any women, they always took glances at my crotch as they spoke to me.

11-21-18. Thursday, I missed work due to the stress at work. I went to the doctor to get sleeping pills. I went back the next day and in the lunchroom Eric came up to me and asked me if I was feeling better. That was a first; I could tell he was worried about what I was going to say. Its amazing that when the company knows about harassment going on to you they act really concerned about you at first, then they play the ' we'll put you in your place ' game to let you know that if you decide to do anything, your gone.

Over a week later on Monday; Jeff Van Asten came in at 6am and I at 7am. When I came in the schedule was different than when I checked it at home time the day before. Karin the scheduler switched our start times so it would appear that I came in late. The issue was Jeff was having a fit that he came in early, and he wasn't getting paid for it. Karin switched the start times back. At this time the schedule wasn't available online, we would have to check it before we left, call the scheduler when we got home and hoped they didn't leave yet or come in early the next day so we weren't late.

One day I was working on the process line by the chiller. It was cool and drafty there. My next rotation, was put sauce begs into the box. Even though it was a short distance away, it was a lot warmer. When I rotated my stuff dropped being warm. Amy Fucile noticed right away and yelled to Jodi ' see what you did now'. She walked over by the water cooler and called that QC lady (don't know her name). Right away she came over by me to act like she was checking a bag and proceeded to stare at my crotch. Then walked away.

Line 251 was now scheduled to shut down completely in June. We had a factory five to talk about 251 shutting down and the

positions available in the new plant. Eric the supervisor made a comment that it was going be be really, really cold there and everyone would be working in close confined spaces. In other words, he was telling me I wasn't welcome there. Like I'm walking around with an erection! What a slap in the face! This is the kind of influence Melissa Bratz has on Erick.

After everyone left for the new plant, I was working on line 255. Not much to report due to Melissa, Bruce, Chad, and Vicki zahn going to the new plant. Mark miller went to the process side. Amy was still here, along with Jeff van Asten.

Dkt. No. 135 at 159-60.

It doesn't appear that these are contemporaneous notes because the plaintiff starts with the admission that he doesn't have much to report for 2016. Even if the notes had been filed in opposition to summary judgment, and in a form that would be admissible at trial, the plaintiff's allegations are based on speculation. He felt uncomfortable because of the temperature in the building and perceived that others were staring at him or making sexual innuendos about cold buildings and tight spaces. Based on a comment about the new plant being cold, the plaintiff speculated that he wouldn't be welcome in the new plant or that people assumed he was "walking around with an erection." Id.

The plaintiff also believes that Zahn—at some point in time—"requested to be on his Facebook so she had an identification link to spy on him on the internet." Dkt. No. 144 at 13. While there doesn't seem to be any evidence in the record that this occurred, the plaintiff admits that Zahn's alleged monitoring didn't deter him from continuing to view pornography because "he wasn't doing anything illegal." Id. He believes that Clauson wore everything

47

that was similar to what he viewed online "besides the pearl necklace, which wouldn't have been allowed on the production area." Id. Again—without citation—the plaintiff asserts that this is proof that the defendant knew of Zahn's alleged "integrity issues" and that someone joined with Zahn to use his pornography activity against him "because of what is going on with these women." Id.

The court has no record evidence of what the plaintiff *perceived* to be harassment and the incidents that he reported to Herrera or his claims—in his opposition brief—that he discussed "with Keisner all the harassment stunts by Clauson and peers" on August 28, 2017. Dkt. No. 144 at 14. He admits that he didn't report all the conduct, testifying that he did not "run to HR whining about everything that happen[ed]" during his employment. Dkt. No. 139 at ¶51 (citing Dkt. No. 140-1 at 72, lines 18-20). In the plaintiff's opposition brief, he claims that this conversation with Keisner included "Behnke and Van Asten thinking they can get [him] fired, Clauson parking lot stunt 4-16-17, Clauson whistling stunt imitating a blowjob 4-24-17, Clauson activating me on Facebook messenger 7-29-17, Clauson saying she wanted to fuck the Plaintiff, talked about his faith, politics are like soap operas, latest smear in which [the plaintiff] hate[s] liberals and many other things." Dkt. No. 144 at 15. The court hasn't located any record evidence—in a form that would be admissible at trial—that supports the plaintiff's assertion that Clauson said "she wanted to fuck the Plaintiff, talked about his faith, politics are like soap operas, latest smear in which [the plaintiff] hate[s] liberals and many other things." Id.

48

Moreover, these other incidents are based on the plaintiff's speculation that Behnke and Van Asten wanted him fired, that Clauson looked at his car in the parking lot (when there were other cars parked around him) or that Clauson's act of pulling her purse strap over her shoulder and putting her tongue in her cheek implied fellatio.

### b. Harassment Based on a Protected Characteristic

Even assuming that everything had been reported to the defendant, the plaintiff has failed to establish that any of the alleged conduct was based on a protected characteristic such as religion, sex or age. Poullard v. McDonald, 829 F.3d 844, 858–59 (7th Cir. 2016) (holding no actionable hostile work environment existed where primary allegations of harassment had "a tenuously arguable connection to race" and "were at worst mild and ambiguous"). The plaintiff cites to the depositions of Barabara Finnel and Vicki Zahn to refute the defendant's argument that the alleged harassment was not based on a protected characteristic. The court has reviewed both of the transcripts filed by the plaintiff and they do not support his argument.

Finnel, with whom the plaintiff had a "friendship relationship," never worked for the defendant, dkt. no. 144-2 at p. 27, lines 16-17, and never witnessed how the plaintiff was treated at work, Id. at p. 28, lines 21-24. Finnel testified that she recalled the plaintiff was distressed about things happening at work but added that she stopped listening to him because "when somebody's all upset, they're giving you bits and pieces but they're not giving you the whole story." Id. at p. 31, lines 3-14. Finnel testified that she adhered to a "biblical"

49

diet and that she attended a banquet with the plaintiff but did not recall what she was served. Id. at p. 29, lines, 18-22. She recalled nothing more than that she got the wrong plate. Id. at p. 33, lines 10-12.

The plaintiff says that Finnel remembers him "pointing out the issues with the dinner plates and management's harassments." Dkt. No. 144 at 4. Finnel actually testified that she was "confused at the point of what he was trying to point to me on what he thought was wrong and what he was speculating in his mind at time." Dkt. No. 144-2 at 33, Tr. p. 20, lines 21-25; 34, Tr. p. 21, lines 1-2. She testified that she recalled the plaintiff talking to management but that she "couldn't follow it." Id. at 34, Tr. p. 21, lines 10-12. At best, Finnel's testimony establishes that the server at the banquet gave her the wrong plate and that someone may have forgotten to call the plaintiff's name at the banquet to acknowledge his five years of service. Finnel was not an eyewitness to any of the alleged harassment.

The plaintiff himself testified that he doesn't have religious beliefs but that he has a "scripture-based" faith that he does not think is based on Christianity. Dkt. No. 140-1 at 4, Tr. p. 15, lines 1-21. The plaintiff testified that his religious beliefs change "constantly," dkt. no. 140-1 at 5, Tr. p. 20, lines 16-22, and that his views have changed "a lot" since 2014. Id. at lines 23-25. In any event, Finnel's testimony does not create a genuine issue of material fact that the plaintiff was subject to unwelcome harassment based on his scripture-based beliefs or any protected characteristic.

50

The court is unclear as to how Zahn's testimony would create a genuine issue of material fact. Zahn denied going out for drinks with other employees, dkt. no. 144-2 at 65, denied talking about sex to other employees, id., denied asking the defendant if he slept with any women in his social group, id., denied harassing anyone at work, id. at 66, and denied knowing that the plaintiff blocked her on Facebook, id. at 68. Zahn also denied ever seeing Clauson make a gesture toward the plaintiff or giving Clauson a signal to make a gesture. Id. at 68. She denied monitoring people on Facebook, id. at 69, or using it as a tool to spy on people, id. at 70. She testified that she never gossiped to others about the plaintiff's porn use. Id. at 71. She denied that there was a competition with the other employees to sleep with the defendant. Id. at 71. She denied spreading a rumor that the plaintiff "beat the crap out of Bruce Behnke." Id. at 76. She testified that she doesn't believe that her daughter knows the plaintiff. Id. at 77. She also testified that she didn't recall saying that her husband wouldn't wear a pink shirt, id., and that she had "no clue" if she ever asked anyone if a quarter she picked up off the floor belonged to them, id. at 109. While the plaintiff claims to have caught Zahn in three lies in his "reaction to the defendant erroneous analogies of his opposition to summary judgment," dkt. no. 148 at 2, the lies are not apparent on this record.

Neither Finnel's nor Zahn's testimony supports a finding that the alleged harassment had anything to do with a protected characteristic. At times, the plaintiff appears to be arguing that he was harassed because he was an older man with scripture-based beliefs who practiced abstinence. Yet the unrefuted

51

testimony in the record is that the plaintiff sent Clauson a Facebook message at the end of February in 2017, dkt. no. 140-1 at 27, Tr. p. 69, lines 4-25, expressing how much he liked her and that he wanted to pursue a relationship with her. He reported Clauson's alleged conduct toward him only after Herrera discussed with him Clauson's complaint *about him.* He didn't tell Herrera that he felt Clauson's conduct was harassment based on sex. The plaintiff believes that Clauson wanted him fired, dkt. no. 140-1 at 29, Tr. p. 71, lines 7-16, and he told Herrera that Clauson may have been "pissed off" because she couldn't seduce an older man.

Several of the alleged "harassments" have nothing to do with a protected characteristic. For example, the plaintiff claimed that Behnke would "smart mouth" or "slander him," dkt. no. 140-1 at 48, Tr. p. 95, lines 9-18. Specifically, he testified that Behnke "constantly runs his mouth around people. Walks by and makes stupid remarks like there he goes again. You know, if somebody does something to you, then he comes — you know all of a sudden, you're the bad person for reporting it." Id. The plaintiff alleged that Van Asten told Behnke that "someone should put him six feet under." Id. at lines 22-25; 49, Tr. p. 96, lines 1-3. The plaintiff claimed that that on March 12, 2018, Emily DenDecker, Ricky Ferron, and Owen Carle (and perhaps Tony Wittman) were throwing boxes that hit his arm as he filled up a pallet. Dkt. No. 140-1 at 55, Tr. p. 104, lines 8-25; 56, Tr. p. 105, lines 1-24; 61, Tr. p. 173 22-25; 62, Tr. p. 174, lines 1-25; 63, Tr. p. 175, lines 1-25. Nothing in the record suggests that this occurred because of a protected characteristic. Construing

52

all the potentially admissible evidence in the light most favorable to the plaintiff, there is no basis to conclude that someone switched his dinner order, forgot to call his name for recognition, slandered him, wore makeup, looked at his car, threw boxes or engaged in any other conduct because he was an older man with sincerely held scripture-based beliefs.

### c. Severe or Pervasive Harassment

The plaintiff's arguments also falls short on the third element: that the harassment was so pervasive or severe that it altered the conditions of his employment. When determining whether the harassment was severe or pervasive, the court employs both an objective and a subjective test. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); see also EEOC v. Costco Wholesale Corp., 903 F.3d 618, 625 (7th Cir. 2018). The subjective beliefs of an employee are not sufficient alone to meet this standard. Yancick v. Hanna Steel Corp., 653 F.3d 532, 544 (7th Cir. 2011). "[T]he environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Smith v. Ne. Ill. Univ., 388 F.3d 559, 566 (7th Cir. 2004) (quotations omitted).

Many of the plaintiff's allegations are based on his subjective beliefs, not on conduct that is objectively hostile. For example, the plaintiff believes that Clauson was trying to get him fired. No one told him that Clauson wanted him fired; he bases that belief on "his interactions with people [he] worked with." Dkt. No. 140-1 at 29, Tr. p. 29, lines 4-16. The plaintiff testified in his deposition that Clauson "was doing these little harassment stunts where she

53

would just stare at you, walk right in front of you and just stare at you, not say a word, no good morning, no whatever." Id. at 32, Tr. p. 74, lines 6-10. He testified that Clauson ignored him, id. lines 11-13, and suspects that she may have been "pissed off" because she couldn't seduce him. Id. at 35, Tr. p. 77, lines 23-25; 36, Tr. p. 78, line 1.

In his deposition, the plaintiff recalled an incident in March or April of 2017 where Clauson stood in the parking lot, laughed and pointed at his car "like she was going to vandalize it or whatever with Amy Fucile." Id. lines 6-20. Yet he admitted that there were other cars parked around his. Id. lines 21-22. The plaintiff repeatedly referenced a "blowjob stunt" in which Clauson walked by him, picked up her bag and stuck her tongue in her cheek. Id. at 43, Tr. p. 90, lines 1-11. The plaintiff testified that he believes that Zahn signaled to Clauson to perform this "stunt" by picking a quarter up off the floor and asking the plaintiff if it was his quarter. Id. lines 19-25; 44, Tr. p. 91, lines 1-9. The court has read all of the deposition testimony provided but isn't clear how Clauson's or Zahn's behavior gave the plaintiff this impression, and Zahn denies that it occurred. In his brief, the plaintiff further asserts—without evidence—that Zahn used Facebook to spy on him and see what pornography he was viewing on the computer. Dkt. No. 144 at 15. The court isn't familiar with technology that would allow someone using Facebook messenger to spy on another's pornography use in his home, but at the summary judgment stage it was incumbent on *the plaintiff* to produce some evidence to support his

54

allegations. None of the alleged harassment involving Clauson created an *objectively* hostile work environment.

As for the alleged harassment dating back to 2012 involving other employees, the plaintiff claimed that Skarga was "deliberately doing things to slow [the plaintiff] down." Dkt. No. 140-1 at 39, Tr. p. 82, lines 13-25. According to the plaintiff, Skarga would shut off machines, hit E stops, and soak the plaintiff. Id. at 40, Tr. p. 83, lines 1-11. But the reason that the plaintiff believes Skarga was targeting him was because "people just don't stop the machine you're working on for no reason." Id. at 41, Tr. p. 84, lines 1-6.

In 2018, the plaintiff says that he heard Van Asten say that someone should put "him" ten feet under. Dkt. No. 140-1 at 48, Tr. p. 95, lines 22-25; 49, Tr. p. 96, lines 1-4. The plaintiff testified that he did not hear the statement directed at him. He simply believes that the comment was directed at him because he worked with "these people." Id. at 49, Tr. p. 96, lies 4-11. Additionally, the plaintiff described the following incident involving Zahn's daughter (who does not work for the defendant):

> Q    So you also described some issues with Vicky Zahn and that
>       you believed her daughter overheard you say something
>       about Ms. Clauson during a haircut; is that correct?
> A    I believe I know she did.
> Q    How do you know she overheard you?
> A    Because she worked right next-door where I was getting the
>       haircut.
> Q    Has Ms. Zahn's daughter ever worked at [the defendant]?
> A    No.
> Q    Have you ever had a conversation with Ms. Zahn's daughter?
> A.    No.
> Q.    So you don't really know if Ms. Zahn's daughter knows who
>       you are, correct?
> A.    Oh, I do.

55

| Q. | How do you know she knows who you are? |
| A. | Because Vicky Zahn was on my Facebook. |
| Q. | Okay. So because Vicky Zahn was on your Facebook, her daughter knows who you are? |
| A. | Part of it. She knows because of her mom. |
| Q. | Okay. Had you ever met Ms. Zahn's daughter before? |
| A. | No. |
| Q. | Ever have a conversation with her? |
| A. | No. |

Id. lines 24-25; 50, Tr. p. 97, lines 1-25.

The plaintiff also testified that Aaron Beitler made a comment about "wanting to beat the shit out of him." Id. at 53, Tr. p. 100, lines 3-5. The plaintiff never heard Beitler say his name and Beitler didn't make the comment directly toward him; the plaintiff assumes the comment was about him because Beitler jumped when he realized that the plaintiff was standing behind him. Id., lines 6-24.

The plaintiff's own deposition testimony fails to establish objectively pervasive and severe harassment. Subjectively, the plaintiff perceived the actions of his coworkers to be harassing. Objectively, the events that he cites amount to, at worst, immature and ignorant behavior. See, e.g., Shafer v. Kal Kan Foods, Inc., 417 F.3d 663, 665 (7th Cir. 2005) (finding that despite the sexual and physical nature of co-worker's conduct, the plaintiff "ha[d] not established that his encounters with [the co-worker] reflected more than personal animosity or juvenile behavior"). To the extent that the plaintiff reported the alleged harassment, there is no dispute that Biehn interviewed the plaintiff, his supervisor and the employees that he identified, but the investigation did not corroborate the plaintiff's allegations of misconduct by

56

other employees. Dkt. No. 139 at ¶74; 141 at ¶31. The court will dismiss the plaintiff's hostile work environment claim.

## 2. *Discrimination*

Next, the defendant argues that plaintiff's discrimination claim fails because he cannot make a *prima facie* case under the <u>McDonnell Douglas</u> burden-shifting framework and he cannot show pretext. Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. §2000e-2(a)(1). When a defendant moves for summary judgment in a discrimination case, the "singular question" for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, color, religion, sex or national origin caused the discharge or other adverse employment action. <u>Igasaki v. Ill. Dep't of Fin. & Pro. Regul</u>., 988 F.3d 948, 957 (7th Cir. 2021) (quoting <u>Purtue v. Wis. Dep't of Corr.</u>, 963 F.3d 598, 602 (7th Cir.), <u>reh'g denied</u> (July 31, 2020)). Put another way, "[a]t summary judgment, '[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor.'" <u>Igasaki</u>, 988 F.3d at 958 (quoting <u>Vega v. Chi. Park Dist</u>., 954 F.3d 996, 1004 (7th Cir. 2020). The plaintiff has not presented evidence that would allow a factfinder to conclude that his religion, sex or age caused the discharge (or any other type of adverse action).

57

The plaintiff may proceed under the McDonnell Douglas framework, but must first establish a *prima facie* case of discrimination before the burden shifts to the defendant. If the burden shifts to the defendant, the defendant then may try to provide a legitimate justification for firing the plaintiff; if it does, the burden then shifts back to the plaintiff to show that the justification is pretext. See Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000).

The plaintiff didn't reference McDonnell Douglas or the burden-shifting framework. There simply is no evidence in this record that points directly to a discriminatory reason for the defendant's decision to terminate the plaintiff. If the plaintiff was attempting to make a *prima facie* case under the indirect method, he needed to demonstrate that (1) he belongs to a protected class; (2) he performed his job according to the defendant's legitimate expectations; (3) he suffered an adverse employment action and (4) that similarly situated employees outside the protected class were treated more favorably. See Simpson v. Franciscan Alliance, Inc., 827 F.3d 656, 661 (7th Cir. 2016).

The court will assume that the plaintiff would argue that he is protected because he is an older, white male with scripture-based beliefs about abstaining from sex before marriage. The undisputed evidence in the record establishes that the defendant referred the plaintiff to its EAP for counseling after the plaintiff made several unsubstantiated complaints over the course of twelve months, largely related to an employee who no longer worked with him. Dkt. No. 139 at ¶86. The plaintiff was terminated when he failed to comply with

58

the requirements for counseling. There is no evidence of a similarly situated employee outside of the protected class who was treated more favorably.

The plaintiff believes that "any employee who wasn't harassed or liked by his supervisors" was treated better than him. Dkt. No. 139 at ¶95. He also argued in his unauthorized "reaction to the defendant erroneous analogies of his opposition to their summary judgment" that Clauson was a peer who was "shipped away to work in either Kiel or Plymouth by May 2017." Dkt. No 148 at 3. Clauson is not a comparator; Clauson was a female in her twenties who reported harassment and there is nothing to suggest that she failed to cooperate with EAP counseling requirements. The only evidence in the record regarding similarly situated peers was presented by the defendant, dkt. no. 139 at ¶¶95-112, but the defendant has not identified an employee with the same supervisor, who engaged in similar conduct and failed to cooperate with EAP requirements. The plaintiff simply makes no arguments about this requirement in his opposition brief.

Ultimately, the defendant has offered a legitimate, non-discriminatory reason for terminating plaintiff's employment. The plaintiff signed the EAP referral and consent form detailing the consequences of failing to comply with the EAP counseling program. Id. at ¶78. That document came into the record as an attachment to the plaintiff's deposition:

EXPECTATIONS AND CONSQUENCES

•Sign a consent form authorizing EAP to report your compliance, dates of service, progress, and any further recommendations. If you refuse to sign the consent form you will be considered

59

insubordinate and your employment will be terminated immediately.

•If treatment is recommended and you refuse, or you violate any EAP recommendations, including missing scheduled appointments, you may face disciplinary action up to and including termination.

•The initial EAP assessment appointment must be scheduled no later than 5:00 pm April 9, 2018. Call EAP at 1-800-236-3231 to make the appointment.

If you do not follow the EAP recommendations, are not cooperative and compliant you may be subject to disciplinary action up to and including termination. If you are found to be in violation of any company policy, including attendance, job performance or personal conduct, you may be subject to disciplinary action up to and including termination.

Dkt. No. 140-1 at 66, Ex. 4. It is undisputed the plaintiff understood that if he did not cooperate with the EAP, the defendant could take disciplinary action up to and including termination. Dkt. No. 139 at ¶82. Yet the plaintiff added conditions to Dr. Burbach's consent and authorization form and refused to participate in counseling unless Dr. Burbach acted on those conditions. Id. at ¶90. The plaintiff did not attend the appointment with Dr. Burbach. Id. Dr. Burbach's office informed the defendant that Dr. Burbach could not complete the assessment because of the plaintiff's unwillingness to accept the authorization form. Id. at ¶91. The defendant, who had referred the plaintiff to EAP after determining that he was struggling to get along with his colleagues, then terminated the plaintiff's employment because he refused to comply with the EAP counseling requirements. Id. at ¶94. Judge Adelman, another judge in

the Eastern District of Wisconsin, has held that a plaintiff's inability to work well with her colleagues and failure to sign the authorization form for EAP counseling (to confirm her attendance) was a legitimate, non-discriminatory reason for termination. See Walker v. Children's Hosp. of Wis., Case No. 17-C-583, 2019 WL 5863930, *5 (E.D. Wis. Nov. 8, 2019).

Because the defendant has identified a legitimate, non-discriminatory reason for terminating the plaintiff, the burden shifts back to the plaintiff to present sufficient evidence to allow a reasonable jury to find that the defendant's stated rationale for his termination was false and that the defendant's actions were "based on prohibited discriminatory animus." Benuzzi v. Bd. of Educ. of City of Chi., 647 F.3d 652, 663 (7th Cir. 2011). The plaintiff "must do more than simply allege that an employer's stated reasons are inaccurate; he must still have some circumstances to support an inference that there was an improper motivation proscribed by law." Id. at 663. While the plaintiff has offered several conspiracy theories involving the defendant, none of them are supported by admissible evidence. The plaintiff has failed to present sufficient evidence to raise a genuine issue of material fact as to whether the defendant's reason for his termination was pretextual. The court will grant the defendant's motion as to the discrimination claim.

      3.    *Retaliation*

To the extent that the plaintiff brings a separate retaliation claim, he was required to produce some evidence that (1) he engaged in statutorily protected activity; (2) his employer took a materially adverse action against him; and (3)

the adverse action was caused by the protected activity. Smith, 936 F.3d at 559-60. To make this showing, the plaintiff could have referred to direct evidence or circumstantial evidence such as "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." Adebiyi v. S. Suburban Coll., 98 F.4th 886, 892 (7th Cir. 2024) (quoting Rozumalski v. W.F. Baird & Assocs., Ltd., 937 F.3d 919, 924 (7th Cir. 2019)).

The plaintiff reported conduct that he perceived to be harassing to Herrera, Biehn and, possibly, Keisner. The defendant terminated the plaintiff based on his failure to execute the required forms for EAP counseling. The court has not located any evidence that the adverse action was taken because of a protected activity. The plaintiff claims that he has "proved [the defendant's] Management retaliated against the Plaintiff by altering documents, falsifying evaluations, tampering with attendance records and denying the plaintiff protective status" but nothing in the record supports these allegations. Dkt. No. 144 at 24. The court is not clear what records the plaintiff claims have been altered, what evaluations he claims were falsified or how his attendance records relate to his retaliation claims. He wasn't fired for missing work; the defendant warned the plaintiff about the possible consequences of failing to sign the consent form or missing appointments and fired the plaintiff after he refused to sign Dr. Burbach's form. The court will grant the defendant's motion as to the plaintiff's retaliation claim.

4. *Civil Conspiracy*

The plaintiff included a civil conspiracy theory in his second amended complaint. In Wisconsin, a claim for civil conspiracy requires an underlying tort to be actionable. Cox v. Med. Coll. of Wis., Inc., 651 F. Supp. 3d 965, 1031 (E.D. Wis. 2023). The court has granted judgment in favor of the defendant on the plaintiff's federal harassment, discrimination and retaliation claims and the plaintiff has not raised any other state law tort claim. In addition, the defendant is a corporation and a corporation cannot conspire with its own employees. Starsurgical Inc. v. Aperta, LLC, 40 F. Supp. 3d 1069, 1078 (E.D. Wis. 2014); see also Travis v. Gary Cmty. Mental Health Ctr., Inc., 921 F.2d 108, 110–11 (7th Cir.1990).

II. **Conclusion**

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 137.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 10th day of September, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

63